# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued April 4, 2023          Decided June 30, 2023

No. 22-7072

MARTIN DOHERTY,
APPELLANT

v.

TURNER BROADCASTING SYSTEMS, INC.,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:20-cv-00134)

*Martin Doherty*, pro se, argued the cause and filed the briefs for appellant.

*Victoria Scott Kingham*, Student Counsel, argued the cause as *amicus curiae* in support of appellant. With her on the briefs were *Erica Hashimoto*, Director, and *Tiffany Yang*, Supervising Attorney, both appointed by the court, and *Madeline Terlap*, Student Counsel.

*Denise E. Giraudo* argued the cause for appellee. With her on the brief was *Christopher R. Williams*.

Before: WILKINS and WALKER, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

WILKINS, *Circuit Judge*:  Martin Doherty injured himself on the job while working as a photojournalist for media corporation Turner Broadcasting Systems, Inc.   In the following years, while he was unable to work, Turner paid him for his leave.  Doherty claims that because his injury was job-related, Turner paid him workers' compensation, while Turner claims that it paid him according to a separate disability policy.  This distinction has legal significance because income earned as workers' compensation is non-taxable, while disability payments are taxed.  Turner reported the compensation as part of Doherty's taxable income on the W-2s it filed with the IRS.

Doherty sued Turner under 26 U.S.C. § 7434 for willfully filing fraudulent information returns (the W-2s in question) on his behalf.  He contends that his 2014, 2015, and 2016 W-2s were false because they overstated his taxable income, and that Turner's actions were fraudulent and willful because Turner either knew or should have known that the payments were in fact workers' compensation.  Following discovery, the District Court granted summary judgment for Turner.  First, it found that the W-2s were not false because they accurately reflect the total amounts that Turner paid Doherty in each of the taxable years.  Second, it found that no reasonable jury could conclude Doherty was being paid under the D.C. Workers' Compensation Act.  Third, it found that as a matter of law Turner lacked the scienter (mental state) required under the statute, willfulness, which the District Court determined was akin to specific intent.

We reverse. Under § 7434, a plaintiff must show: (1) the defendant filed an information return on his or her behalf, (2) the return was false as to the amount paid, and (3) the defendant acted willfully and fraudulently, which here is equivalent to knowingly or recklessly. The parties agree that the W-2s qualify as information returns, and Doherty has raised a dispute of material fact as to the second and third elements. As to falsity, Doherty's injury was job-related, and a reasonable jury could therefore conclude that the W-2s were inaccurate because they overstated his taxable income by including workers' compensation. And as to scienter, several pieces of evidence including the language of Turner's own policies as well as communications between Doherty and Turner could lead a factfinder to conclude that Turner knew or should have known the actual nature of these payments.

## I.

Plaintiff Martin Doherty worked as a photojournalist for Defendant Turner Broadcasting Systems, Inc., a media conglomerate, for over fifteen years. In late 2012, he injured himself loading camera equipment while at work. As a result, he needed medical treatment and was unable to perform his job. Turner compensated him in lieu of his wages for those injuries.

Turner apparently has two policies for compensating its employees for leave due to an injury.[1] First, it has a workers'

---

[1] As described, Turner has a workers' compensation policy, J.A. 388–89, and a short-term disability leave policy, J.A. 383–84. There are facial differences between these policies, such as that the former applies to "job-related" injuries or illnesses, J.A. 388, while the latter applies to leave for an employee's "own medical needs[,]" J.A. 383. The former also pays more than 60% in weeks 17 through 26 where required by state law. However, and somewhat confusingly, Turner cites to the policies interchangeably, referring only to the "STD

compensation policy for an employee's "job-related injury or job-related illness[.]" J.A. 388–89. Under that policy, a qualifying employee remains on Turner's payroll for 26 weeks, and is paid, as a percentage of the employee's base salary, as follows:

> Weeks 1-10: 100%
> Weeks 11-16: 80%
> Weeks 17-26: 60%*

J.A. 388. The asterisk indicates that where an applicable state workers' compensation law requires pay at a higher rate for weeks 17 through 26, Turner will comply with state law. Any difference is paid by Turner's workers' compensation insurer, ESIS, which also pays any legally required compensation after week 26. By the policy's terms, "[p]ayments made under this policy are intended to fulfill [Turner's] Worker's [sic] Compensation obligations." *Id.*

Turner also has a short-term disability leave policy, which compensates employees "absent from work due to [their] own medical needs[,]" *i.e.*, any "illness or injury" that makes it "medically necessary" for an employee to miss work for longer than seven days. J.A. 383–84. Under that policy, Turner pays the same percentages as above, without the caveat applicable to weeks 17 through 26. Turner receives federal tax deductions for payments it makes under the disability policy.

In Turner's view, it compensated Doherty under the latter—its disability policy—although it also, and somewhat perplexingly, asserts that it "fulfills its workers' compensation obligation" through that policy. Appellee Br. 4. (In its actual

---

[short-term disability] Plan." *E.g.*, Appellee Br. 4 (citing to J.A. 384 (short-term disability policy) as well as J.A. 388 (workers' compensation policy) when discussing the "STD Plan").

written policies, Turner states that the "Workers' Compensation" policy is how it fulfills its workers' compensation obligation. J.A. 388.) In any event, in Doherty's view, Turner paid him workers' compensation, to which he believes he was entitled under D.C. law. Accordingly, Doherty filed a claim with the D.C. Office of Workers' Compensation for his 2012 injury. Turner received notice of that claim in August 2013. In subsequent rulings in 2014 and 2016, that Office found that the injury was work-related. In 2016, the Office specifically found that Doherty was entitled to 66 and 2/3% of his average salary under D.C.'s workers' compensation law.

The W-2s that Turner filed on Doherty's behalf for tax years 2014, 2015, and 2016 included as part of Doherty's gross taxable income all of his injury-related compensation.

Doherty sued Turner in D.C. Superior Court, and Turner removed to federal district court. He sought damages under 26 U.S.C. § 7434, alleging that Turner willfully filed fraudulent W-2s on his behalf, as well as under various state law theories. The District Court dismissed the state law claims, and they are not before us on appeal. After discovery, the District Court granted summary judgment for Turner on the § 7434 claim and denied Doherty's cross-motion for summary judgment and motion to strike. Doherty timely appealed. For the reasons that follow, we reverse.

## II.

We review a decision granting summary judgment *de novo*. *Lopez v. Council on American-Islamic Rels. Action Network, Inc.*, 826 F.3d 492, 496 (D.C. Cir. 2016). "Summary judgment is appropriately granted when, viewing the evidence in the light most favorable to the non-movants and drawing all reasonable inferences accordingly, no reasonable jury could

reach a verdict in their favor." *Id.* There must be "no genuine dispute as to any material fact[,]" and the movant must be "entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

**A.**

**1.**

The Internal Revenue Code creates a private cause of action if "any person willfully files a fraudulent information return with respect to payments purported to be made to any other person[.]" 26 U.S.C. § 7434(a). The parties primarily dispute the statute's scienter requirement. As far as we are aware, neither the Supreme Court nor our Court has construed this provision, so we write on a largely blank slate.

"[W]e start, as always, with the language of the statute." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 187 (2016). Here, Congress defined neither "willfully" nor "fraudulent," terms that both relate to a hypothetical defendant's state of mind. "But it is a settled principle of interpretation that, absent other indication, Congress intends to incorporate the well-settled meaning of the common-law terms it uses." *Id.* (internal quotation marks and alterations omitted); *see also Safeco Ins. Co. v. Burr*, 551 U.S. 47, 58 (2007) (describing the "general rule that a common law term in a statute comes with a common law meaning, absent anything pointing another way").

The Supreme Court has described "willfully" as a "word of many meanings whose construction is often dependent on the context in which it appears[.]" *Safeco*, 551 U.S. at 57 (quoting *Bryan v. United States*, 524 U.S. 184, 191 (1998)). That said, the "common law usage" of willfulness encompasses actions taken either knowingly or in "reckless disregard of the law[.]" *Safeco*, 551 U.S. at 57 (internal quotation marks

omitted). The Supreme Court and lower courts have adhered to that traditional definition particularly where, as here, "willfulness is a statutory condition of civil liability[.]" *Id.*; *see also United States v. Rum*, 995 F.3d 882, 888–89 (11th Cir. 2021) (*Safeco*'s approach to willfulness reflects the "general consensus among courts" in civil contexts).

In § 7434, Congress reinforced "willfully" with "fraudulent," which "is a paradigmatic example of a statutory term that incorporates the common-law meaning of fraud." *Universal Health Servs.*, 579 U.S. at 187; *see also United States ex rel. Schutte v. SuperValu Inc.*, 143 S. Ct. 1391, 1400 (2023) (explaining that the False Claims Act reinforces the term "fraudulent" with "knowingly" and defines the latter in a way that "track[s] the common-law scienter standards for fraud"); *Neder v. United States*, 527 U.S. 1, 22 (1999). That traditional meaning encompasses false statements made with one of three states of mind, consistent with the definition of "willfully" explained above. *SuperValu Inc.*, 143 S. Ct. at 1400. As articulated by a "widely cited" 1889 English decision: "Fraud is proved when it is shewn that a false representation has been made (1) knowingly, or (2) without belief in its truth, or (3) recklessly, careless whether it be true or false." *Id.* (alteration omitted) (quoting *Derry v. Peek* [1889] 14 App. Cas. 337, 374 (HL)); *accord* RESTATEMENT (SECOND) OF TORTS § 526 cmt. e (1977) ("[F]raud is proved if it is shown that a false representation has been made without belief in its truth or recklessly, careless of whether it is true or false."). That common law definition is echoed by modern dictionary definitions. *See* Fraud, Black's Law Dict. (11th ed. 2019) ("fraud *n.* (14c) 1. A knowing misrepresentation . . . 2. A reckless misrepresentation made without justified belief in its truth . . .").

In sum, 26 U.S.C. § 7434 requires a plaintiff to show that (1) the defendant filed an information return on his or her behalf, (2) the return was false as to the amount paid, and (3) the defendant acted knowingly or recklessly.

**2.**

Turner offers a different interpretation of the statute's scienter requirement, but we are unpersuaded. In its view, "fraud" in this context "requires 'intentional wrongdoing' and an 'intent to deceive.'" Appellee Br. 16–17, 32. Building upon that argument, Turner argues that the statute's use of "willfulness" cannot encompass "mere recklessness," pointing back to the statute's use of the term "fraudulent." Appellee Br. 28–30.

That reading is flawed for several reasons. To start, it does not explain, based on either the text or structure of the statute, why we should depart from the common law definition of the terms "fraudulent" and "willful." "There being no indication that Congress had something different in mind, we have no reason to deviate from [that] understanding[.]" *Safeco*, 551 U.S. at 69. Another basic problem with this interpretation is that Turner essentially reads the word "willfully" out of the statute—its entire argument appears to rely on defining the word "fraudulent"—but we "must give effect, if possible, to every . . . word of a statute." *Liu v. SEC*, 140 S. Ct. 1936, 1948 (2020).

Turner's error is made clear by the fact that its proffered interpretation matches the *mens rea* required in criminal tax fraud cases, where "willfully" connotes "a voluntary, intentional violation of a known legal duty." *Cheek v. United States*, 498 U.S. 192, 200–01 (1991); *cf. Bryan*, 524 U.S. at 191 ("[W]hen used in the criminal context, a 'willful' act is one undertaken with a 'bad purpose.'"). The District Court made

the same mistake, and while Turner does not cite *Cheek* in its briefing, it relies on an unpublished Sixth Circuit opinion that uses the *Cheek* standard in discussing § 7434's scienter requirement. *See Vandenheede v. Vecchio*, 541 F. App'x 577, 580 (6th Cir. 2013) ("[W]illfulness in this context connotes a voluntary, intentional violation of a legal duty." (internal quotations omitted)). But as *Cheek* acknowledged, this definition of willfulness is "an exception to the traditional rule." 498 U.S. at 200. The reason for this "special treatment of *criminal* tax offenses" is to prevent turning a "bona fide misunderstanding" into criminal conduct, especially given "the complexity of the tax laws." *Id.* (emphasis added). For that reason, "Congress . . . softened the impact of the common-law presumption by making specific intent to violate the law an element of certain federal criminal tax offenses." *Id.* A statute with civil penalties does not carry the same risk, and we therefore find *Cheek*'s specific intent requirement inapplicable to statutes that create a civil cause of action. *See Lefcourt v. United States*, 125 F.3d 79, 83 (2d Cir. 1997) (declining to apply *Cheek* "in the context of [] civil tax penalties").

Lastly, to be sure, we agree with Turner's contention that a defendant's "mere negligence or error" cannot establish fraud. Appellee Br. 17. Our interpretation of "fraudulent" and "willfully"—which here includes reckless conduct—is consistent with that view. "While 'the term recklessness is not self-defining,' the common law has generally understood it in the sphere of civil liability as conduct violating an objective standard: action entailing 'an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Safeco*, 551 U.S. at 68 (quoting *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)). That risk must be greater than mere carelessness or negligence. *Id.* at 69. Section 7434 certainly does not hold defendants liable for mere error in filing information returns.

**B.**

Turning to the facts here, we first note that the parties agree that Doherty's W-2s qualify as information returns. The two questions before us are therefore whether Doherty has raised a genuine dispute of material fact that (1) the returns were false as to the amount paid, and (2) Turner filed them knowing they were false or with reckless disregard. We conclude that he has for both.

**1.**

The federal tax code excludes workers' compensation payments from an employee's taxable gross income. 26 U.S.C. § 104(a)(1) ("[G]ross income does not include— . . . amounts received under workmen's compensation acts . . ."); *see also* 26 C.F.R. § 1.104-1(b). Thus, if Turner included workers' compensation payments on Doherty's W-2s as part of his taxable gross income, each W-2 by definition contained a misrepresentation as to the amount paid. 26 U.S.C. § 104(a)(1). Had Turner properly excluded Doherty's workers' compensation, the *amount* of taxable gross income on his W-2's would have been different. *See Liverett v. Torres Advanced Ent. Sols. LLC*, 192 F. Supp. 3d 648, 653 (E.D. Va. 2016) ("[Section] 7434(a) creates a private cause of action only where an information return is fraudulent with respect to the amount purportedly paid to the plaintiff.").

Drawing inferences in Doherty's favor, as we must, a reasonable jury could easily conclude that the injury-related compensation Turner paid Doherty was workers' compensation, regardless of whatever label Turner now attaches to it. Doherty filed a claim for workers' compensation in 2013, of which Turner was aware. The D.C. Office of Workers' Compensation concluded that Doherty's injuries arose from a work-related incident. Turner did not dispute that

finding. Even in this litigation, Turner "does not dispute that, at various times from 2014-2016, [Doherty] was out of work on leaves of absence due to alleged workplace injuries." J.A. 543 (Turner's Response to Doherty's Statement of Material Facts). By its own terms, Turner's Workers' Compensation policy plainly covers such payments for a "job-related injury[.]" J.A. 388. And in Turner's own words, payments made under that policy "are intended to fulfill the Company's Worker's [sic] Compensation obligations." *Id.* If all that were not enough, one of Turner's own employees told Doherty as early as 2013 that his compensation at that time was "coded as WC pay." J.A. 501 (March 14, 2013 email from a Turner Human Resources employee to Doherty).

Turner does not seriously dispute any of the above but instead resorts to a different line of attack. It argues that the W-2s were not inaccurate because they did not misstate the total amount of compensation that Doherty received. This argument is unpersuasive because Doherty *does* allege that Turner overstated the amount paid. A W-2 conveys the *taxable* wages paid to an employee. *See* Internal Revenue Service, *General Instructions for Forms W-2 and W-3* (2023), https://perma.cc/A9GB-Z8BL ("Box 1—Wages, tips, other compensation. Show the total taxable wages, tips, and other compensation that you paid to your employee during the year."). Thus, if an employer includes non-taxable compensation in an employee's taxable income, the W-2 necessarily overstates the amount of taxable income the employee was paid. Apply that here. Workers' compensation is not a taxable wage. *See* 26 U.S.C. § 104(a)(1). Therefore, if Doherty proves at trial that Turner paid him workers' compensation, that income should not have been reported as part of his gross taxable income on his W-2s, making them incorrect as to the amount paid.

In sum, there is a factual dispute as to whether Turner overstated Doherty's taxable income on his W-2s.

**2.**

Doherty has also raised a factual question as to scienter, *i.e.*, whether Turner either knowingly or recklessly overstated Doherty's taxable income.  As recounted above, as early as 2013 Turner had not only ample notice but actual knowledge that Doherty's injuries were job-related and that related payments therefore fell under its workers' compensation policy.  And though it is not evidence, Turner's briefing on appeal underscores its own belief regarding the true nature of these payments by claiming that the company "fulfills its workers' compensation obligation, in part, through the STD Plan[.]"  Appellee Br. 4.  We cannot reconcile that statement with the notion that no reasonable jury could conclude that Turner knew, or ought to have known, that it was paying Doherty workers' compensation from 2014 to 2016 (notwithstanding however Turner labeled the payments at the time under its internal policies).

As we have explained, Doherty does not need to show specific intent for his claim to ultimately succeed.  But it is worth noting that he would likely survive summary judgment even under that higher standard; in other words, there is also a factual question whether Turner knew that those payments were not taxable income.  At least one of Turner's Risk Management employees told Doherty as much in writing.  J.A. 458 (January 8, 2016 email from Turner's employee to Doherty stating: "Workers' compensation benefits are not considered taxable income at the state or federal level." (emphases omitted)).  Not only that, a reasonable jury could infer that Turner intentionally misreported the payments as disability for the purpose of evading taxes, as it had a financial motive for

doing so because it received tax deductions as a result. J.A. 508 (Turner's Response to Requests for Admission). Finally, Doherty began alerting Turner to the taxability of his injury-related payments by October 2015 at the latest, and on several occasions thereafter. J.A. 482 (October 6, 2015 email from Doherty to Turner stating that he is owed payments "tax free"); J.A. 459 (January 8, 2016 email from Doherty to Turner employee stating that "WC benefits are not taxable"); J.A. 487 (April 19, 2016 email from Doherty to Turner's Payroll email requesting a corrected 2016 W-2 because it erroneously includes "Workers Compensation [that] is non-taxable[]"); J.A. 518 (May 23, 2016 email from Doherty to Turner employee with extensive calculations regarding this issue). He even filed a substitute W-2 with the IRS for tax year 2015. J.A. 429. Thus, contrary to Turner's assertions, even under a heightened scienter standard a reasonable jury could conclude that Turner knew it was including non-taxable workers' compensation in his W-2s—especially for tax year 2016 following Doherty's repeated communications about that issue.

Finally, Turner falls back on the argument that it paid Doherty directly under the disability plan all along. Because disability payments *are* taxable under 26 U.S.C. § 104(a)(3), the logic goes, Turner maintained a good faith belief that Doherty's W-2s were accurate, "even if [the] payments were more properly classified as workers' compensation[.]" Appellee Br. 26.[2] Perhaps Turner will be able to persuade a jury about its good faith belief that it was not paying Doherty workers' compensation, despite the fact that it acknowledges Doherty's injuries were job-related, and in light of its own policies plus its assertion now that it somehow fulfills its

---

[2] Along the same lines, Turner also states, without citation, that "it is not uncommon for employers to remit taxable [disability] payments after a workplace injury." Appellee Br. 26 n.11. Even if true, that would not render the practice lawful.

workers' compensation obligations through that disability policy. But for the reasons stated, we cannot credit that conclusion as a matter of law, and summary judgment is therefore unwarranted on that basis.

\* \* \*

In conclusion: (1) Doherty's 2014, 2015, and 2016 W-2s are information returns, (2) there is a factual question as to whether they were false as to the amount paid, and (3) there is a factual question whether Turner acted in relevant part knowingly or recklessly. Thus, Doherty's § 7434 claim survives summary judgment.

## III.

Doherty raises several other challenges on appeal, identified as Issues III through VII in his opening brief. He argues that the District Court denied him due process in various ways, including by granting Turner's motion to dismiss and denying his motion for leave to file a surreply, denying his motion to compel, denying him a meaningful opportunity to be heard during a status conference, and for several other similar reasons. None of these amount to a deprivation of judicial process, let alone due process.

## IV.

For these reasons, Doherty's § 7434 claim is reinstated. We reverse and remand for further proceedings consistent with this opinion.

*It is so ordered.*